NUMBER 13-00-472-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


___________________________________________________________________


S.P.A. GIACOMINI, FORMERLY 

KNOWN AS ALBERTO GIACOMINI 

RUBINETTERIE, S.P.A.
, Appellant,


v.



ANGELA LAMPING, CLIFFORD T. 

LAMPING, AND CENTRAL 

PLUMBING & ELECTRIC SUPPLY 

CO.
, Appellees.

___________________________________________________________________


On appeal from the 139th District Court


of Hidalgo County, Texas.


___________________________________________________________________


O P I N I O N



Before Justices Dorsey, Hinojosa, and Castillo


Opinion by Justice Dorsey



 Giacomini Rubinetterie, S.p.A. ("Giacomini") brings this
accelerated interlocutory appeal of a Hidalgo County district court's
order denying its special appearance. See Tex. Civ. Prac. & Rem. Code
Ann. § 51.014(a)(7) (Vernon Supp. 2001); Tex. R. Civ. P. 120a. 
Giacomini contends that the court lacks personal jurisdiction. We affirm
the trial court's denial of Giacomini's special appearance.

 The facts of this appeal are not contested. Angela and Clifford
Lamping, residents of Hidalgo County, sued a group of defendants
including Giacomini for injuries Clifford sustained when an explosion
occurred in their home. Clifford was in bed when the explosion
happened. He sustained catastrophic injuries including burns over 50%
of his body. The Lampings contend that the explosion was caused by
an open, uncapped gas valve that had been installed in the house. 
Giacomini manufactured the gas valve.

 Giacomini filed a special appearance contesting the trial court's
exercise of personal jurisdiction over it. Attached to the special
appearance was the affidavit of Alberto Giacomini, owner of Giacomini,
S.p.A. In his affidavit, he stated that Giacomini, S.p.A. is an Italian
corporation with offices in Italy. It has no offices in Texas, conducts no
business in Texas, has no property or bank accounts in Texas, has
entered into no contracts with parties in Texas, and has no other
contacts with the State of Texas.

 At the heart of this case is the method of distribution of
Giacomini's gas valves in Texas. Giacomini manufactures its products
in Italy. It sells its valves to distributors in the United States, but did not
sell them to any Texas corporation, and does not have any distributors
that are Texas residents. The distributors that it does have are not
"owned by, related to, or controlled by Giacomini, S.P.A.," and
Giacomini has no kind of franchise, licensing or distributorship
agreements with them.

 In the usual course of business, a distributor contacts Giacomini,
S.p.A. either by telephone, fax or e-mail, and places a purchase order for
valves or other products. The distributor specifies a location where
Giacomini should ship its order. Two of Giacomini's distributors, B&K
of Illinois (B&K) and Pegler, Ltd. of England, occasionally have their
valves shipped to the Port of Houston. Giacomini ships them either
C.I.F. or F.O.B. The distributors are free to market the valves in any
manner, and may charge any price.

 Attached to the plaintiff's response was Giacomini's answers to
interrogatories. Some of those answers fleshed out the relationship
between Giacomini and its distributors. There, Giacomini stated that
the only goods it sent to the Port of Houston were shipped C.I.F. to
B&K, and B&K had a broker pick up the delivery. Giacomini stated that
it had no knowledge regarding whether the goods sent to Houston
were intended to be distributed in Texas.

 The Lampings also attached discovery responses from B&K
Industries. B&K stated that it has been purchasing valves from
Giacomini for around 10 years. It also stated that it currently receives
four to six containers per year from Giacomini in Houston, shipped CIF. 
A container carries 65,000 to 85,000 products (i.e., 250,000 products
per year delivered to Houston). B&K stated that Giacomini refers to
B&K and three other U.S. companies as "distributors," although there
is no written agreement regarding the distributorship relationship. 
Rather, there is an understanding that Giacomini will sell directly only
to those companies.

 Also attached to the plaintiff's response was the affidavit of
Richard Kuhlman, Senior Executive Vice President for B&K Industries,
Inc. It stated:

 Giacomini is aware that B&K Industries, Inc. distributes gas
valves it purchases from Giacomini nationwide in the United
States, including the state of Texas through B&K's active
marketing force. In fact, Giacomini expects B&K to distribute
valves nationwide. In 1999 alone, B&K, Industries, Inc.,
purchased over 3,000,000 valves from Giacomini, S.p.A. Of
those valves, many were purchased for distribution in the
State of Texas. Giacomini, S.p.A. is fully aware of B&K,
Industries, Inc.'s distribution efforts and sales of gas valves
in the State of Texas. B&K is one of four distributors of gas
valves in the United States of Giacomini. Other Giacomini
distributors also sell Giacomini products in Texas.


 Giacomini moved to strike Kuhlman's affidavit. The trial court
denied his motion. After hearing arguments, the trial court denied
Giacomini's special appearance. Giacomini brings this interlocutory
appeal of that order.

Objections to Kuhlman's Affidavit


A. Timeliness


 Giacomini objected to the affidavit of Richard Kuhlman and moved
the court to strike the affidavit on two bases. First, Giacomini argues
that the trial court abused its discretion by failing to strike the affidavit
because it was not filed timely. We disagree.

 Texas Rule of Civil Procedure 120a states that:

 The court shall determine the special appearance on the
basis of the pleadings, and any stipulations made by and
between the parties, such affidavits and attachments as may
be filed by the parties, the results of discovery processes,
and any oral testimony. The affidavits, if any, shall be served
at least seven days before the hearing, shall be made on
personal knowledge, shall set forth specific facts as would
be admissible in evidence, and shall show affirmatively that
the affiant is competent to testify.


Tex. R. Civ. P. 120a(3). The following paragraph of that rule states that
"should it appear from the affidavits of a party opposing the motion that
he cannot . . . present by affidavit facts essential to justify his
opposition, the court may order a continuance to permit affidavits to be
obtained or depositions to be taken or discovery to be had or may make
such other order as is just." Id.

 No testimony was taken at the hearing on Giacomini's special
appearance, only arguments of counsel. The court stated that it was
refusing to strike Kuhlman's affidavit because it wanted to consider all
the information available. However, the court offered to give Giacomini
time to respond. Giacomini declined that opportunity, stating that it did
not need more time to respond to Kuhlman's affidavit because "all the
facts are set out in Mr. Giacomini's affidavit." After that, Giacomini did
not re-urge his objection to timeliness. We hold that the trial court did
not abuse its discretion in considering the late-filed affidavit, and
regardless of that, Giacomini waived his complaint regarding the
timeliness of Kuhlman's affidavit by going forward with the hearing
when given the opportunity for a continuance. Cf. Owens-Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998) ("Evidentiary
rulings are committed to the trial court's sound discretion."); Barraza v.
Eureka Co., 25 S.W.3d 225, 228 (Tex. App.--El Paso 2000, pet. denied)
("Rulings concerning the admission or exclusion of summary judgment
evidence are reviewed under an abuse of discretion standard."); see
also Potkovick v. Regional Ventures, Inc., 904 S.W.2d 846, 850 (Tex.
App.--Eastland 1995, no writ) (inferring that a trial court has discretion
to consider a late-filed affidavit under Rule 120a).

B. Lack of Personal Knowledge


 Next, Giacomini contends that Kuhlman's affidavit was not based
on personal knowledge. We apply the abuse of discretion standard to
the trial court's decision regarding admissibility of the affidavit. See
Barraza, 25 S.W.3d at 228. Specifically, Giacomini contends that
Kulhman cannot have personal knowledge regarding what Giacomini
knows about B&K's distribution processes. Kuhlman states in his
affidavit that Giacomini is "aware" that B&K distributes the gas valves
in the U.S. nationwide and in Texas, that Giacomoni "expects" B&K to
distribute the valves nationwide, and that Giacomini is "fully aware" of
B&K's distribution efforts in Texas.

 However, Kuhlman's affidavit also sets forth specific facts
showing that such information is within his personal knowledge. 
Kuhlman stated that he is a Senior Executive Vice President for B&K
Industries, and has worked for the company for approximately 30 years. 
He also stated that B&K orders valves from Giacomini on a regular basis
and has been a distributor of Giacomini's products for over ten years. 
He also stated that B&K currently receives approximately 250,000
products annually from Giacomini at the Port of Houston alone, and
purchased over 3 million valves from Giacomini in 1999.

 Judging from the volume of products imported, B&K maintains a
significant business relationship with Giacomini. Also, B&K has a
longstanding relationship with Giacomini, as Kuhlman testified that it
had been ongoing for ten years. As a senior executive at B&K and as
someone who has worked with the company for 30 years, Kuhlman is
competent to testify regarding the business arrangement between B&K
and one of its major suppliers. Thus, Kuhlman set forth specific facts
showing affirmatively that he is competent to testify as required by Rule
120a(3). See Tex. R. Civ. P. 120a(3).

 Moreover, the facts contained in his affidavit were readily
controvertible. Cf. Tex. R. Civ. P. 166a(c) (stating that summary
judgments may be based on testimony of an interested witness when
it is, among other things, susceptible of being readily controverted). In
fact, Giacomini did not controvert these statements in its own affidavit
except to say that it does not control any part of the manner of
distribution once it has sold the valves to a distributor and that the
distributors do not tell Giacomini where the products are going when
the products leave the dock. In its interrogatory responses, Giacomini
stated that it "has no way of knowing whether or not it is the intent of
B&K to distribute those goods in the State of Texas, or where said
goods will be distributed by them." These statements, though, do not
contradict Kuhlman's statements about Giacomini's knowledge and
expectations regarding B&K's distribution of its products. For all these
reasons, we hold the trial court did not abuse its discretion in refusing
to strike the affidavit. Cf. M.G.M. Grand Hotel, Inc. v. Castro, 8 S.W.3d
403, 407 (Tex. App.--Corpus Christi 1999, no pet.) (holding that
corporate officer had personal knowledge of corporation's contacts with
another state). Having resolved the questions regarding the affidavit,
we now turn to the substance of this appeal. 

Personal Jurisdiction


 A Texas court may assert personal jurisdiction over a nonresident
defendant only if the requirements of both the Due Process Clause of
the Fourteenth Amendment to the U.S. Constitution and the Texas
long-arm statute are satisfied. CSR Ltd. v. Link, 925 S.W.2d 591, 594
(Tex. 1996); see U.S. CONST. amend. XIV, § 1; Tex. Civ. Prac. & Rem.
Code Ann. § 17.042 (Vernon 1997). The long-arm statute allows a court
to exercise personal jurisdiction over a nonresident defendant that does
business in Texas. Tex. Civ. Prac. & Rem Code Ann. § 17.042; CSR Ltd.,
925 S.W.2d at 594. "Doing business" means: (1) contracting by mail
or otherwise with a Texas resident when either party is to perform the
contract in whole or in part in the State of Texas; (2) committing a tort
in whole or in part in this state; (3) recruiting Texas residents, directly
or through an intermediary located in this state, for employment inside
or outside the state; and (4) "other acts." Tex. Civ. Prac. & Rem. Code
Ann. § 17.042. The Texas Supreme Court has repeatedly stated that the
"other acts" may include any set of actions that will satisfy the federal
constitutional due process requirements. CSR, Ltd., 925 S.W.2d at 594;
Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,
815 S.W.2d 223, 226 (Tex. 1991). "Consequently, the requirements of
the Texas long-arm statute are satisfied if the exercise of personal
jurisdiction comports with federal due process limitations." CSR, Ltd.,
925 S.W.2d at 594. The United States Supreme Court has held that a
state court can take personal jurisdiction over a defendant only if (1) it
has some minimum, purposeful contacts with the state, and (2) the
exercise of jurisdiction will not offend traditional notions of fair play and
substantial justice. See Asahi Metal Indus. v. Superior Court, 480 U.S.
102 (1987); Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985);
Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408 (1984);
World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980);
International Shoe Co. v. Washington, 326 U.S. 310 (1945).

A. Minimum Contacts


 In order to have minimum contacts with a forum state sufficient
to confer personal jurisdiction, a nonresident defendant must have
purposefully availed itself of the privileges and benefits of conducting
business in the foreign jurisdiction. Burger King, 471 U.S. at 475-76;
CSR, 925 S.W.2d at 594; Happy Industrial Corp. v. American
Specialties, Inc., 983 S.W.2d 844, 847 (Tex. App.--Corpus Christi 1998,
pet. dism'd w.o.j.). A defendant should not be subject to the
jurisdiction of a foreign state's court based upon "random,"
"fortuitous," or "attenuated" contacts. CSR, 925 S.W.2d at 595
(quoting Burger King, 471 U.S. at 475-76). Minimum contacts are
particularly important when the defendant is from a different country
because of the unique and onerous burden placed on a party called
upon to defend a suit in a foreign legal system. Id.

 A defendant's contacts with a forum can give rise to either general
or specific jurisdiction. General jurisdiction is present when a
defendant's contacts are continuous and systematic, thus the forum
may exercise personal jurisdiction over the defendant even if the cause
of action did not arise from or relate to activities conducted within the
forum state. CSR, 925 S.W.2d at 595; see Charles H. Schlobohm v. Rolf
L. Schapiro, 784 S.W.2d 355, 357 (Tex. 1990). A nonresident must
have conducted more substantial activity in the forum state for the state
to exercise general jurisdiction than for it to exercise specific
jurisdiction. CSR, 925 S.W.2d at 595; Happy Indus. Corp., 983 S.W.2d
at 847. Conversely, specific jurisdiction may be exercised if the
defendant's alleged liability arises from or is related to its activity
conducted within the forum state. CSR, 925 S.W.2d at 595. In this
case, the question is whether Giacomini's activities are sufficient to
establish specific jurisdiction.

 As the Texas Supreme Court noted in CMMC v. Salinas, in
World-Wide Volkswagen, the United States Supreme Court stated a
basis for personal jurisdiction that has come to be referred to as the
stream-of-commerce doctrine:

 [I]f the sale of a product of a manufacturer or a distributor ...
is not simply an isolated occurrence, but arises from the
efforts of the manufacturer or distributor to serve, directly or
indirectly, the market for its product in other States, it is not
unreasonable to subject it to suit in one of those States if its
allegedly defective merchandise has there been the source of
injury to its owner or to others. The forum State does not
exceed its powers under the Due Process Clause if it asserts
personal jurisdiction over a corporation that delivered its
products into the stream of commerce with the expectation
that they will be purchased by consumers in the forum
State.

World-Wide Volkswagen, 444 U.S. at 297-298; CCMC, 929 S.W.2d
435, 437-38 (Tex. 1996).

 Seven years later, Justice O'Connor, speaking for a four-member
plurality, wrote that the rule in World-Wide Volkswagen did not allow
an exercise of personal jurisdiction to be based on the defendant's mere
act of placing the product in the stream of commerce, but the
nonresident defendant must have done something else to have
purposefully availed itself of the market in the forum State. She stated:

 The "substantial connection" between the defendant and the
forum State necessary for a finding of minimum contacts
must come about by an action of the defendant purposefully
directed toward the forum State. The placement of a
product into the stream of commerce, without more, is not
an act of the defendant purposefully directed toward the
forum State. Additional conduct of the defendant may
indicate an intent or purpose to serve the market in the
forum State, for example, designing the product for the
market in the forum State, advertising in the forum State,
establishing channels for providing regular advice to
customers in the forum State, or marketing the product
through a distributor who has agreed to serve as the sales
agent in the forum State. But a defendant's awareness that
the stream of commerce may or will sweep the product into
the forum State does not convert the mere act of placing the
product into the stream into an act purposefully directed
toward the forum State.

Asahi, 480 U.S. at 110-12 (citations omitted). Justice Brennan
expressed the opposing view in stating:

 I see no need for [a showing of additional conduct directed
toward the forum]. The stream of commerce refers not to
unpredictable currents or eddies, but to the regular and
anticipated flow of products from manufacture to
distribution to retail sale. As long as a participant in this
process is aware that the final product is being marketed in
the forum State, the possibility of a lawsuit there cannot
come as a surprise. Nor will the litigation present a burden
for which there is no corresponding benefit. A defendant
who has placed goods in the stream of commerce benefits
economically from the retail sale of the final product in the
forum State, and indirectly benefits from the State's laws
that regulate and facilitate commercial activity. These
benefits accrue regardless of whether that participant
directly conducts business in the forum State, or engages in
additional conduct directed toward that State.

Asahi, 480 U.S. at 11 7 (Brennan, J., concurring in part)(footnote
omitted).

 The Texas Supreme Court has "not taken sides" in the Asahi
debate over the stream-of-commerce doctrine yet, as it has not reached
a case similar enough factually. CMMC, 929 S.W.2d at 438­39. 
Likewise, we find the instant case clearly falls on the side of imposing
jurisdiction. This is not a case of "placement of a product into the
stream of commerce, without more." Asahi, 480 U.S. at 112. Rather,
Giacomini's actions are purposefully directed at the Texas market. 
Giocomini ships mass quantities of its products to a distributor in
Texas, fully aware that the distributor will be marketing significant
quantities to customers in Texas. Giocomini's contacts with Texas
amount to a regular and anticipated flow of products from manufacturer
to distribution to retail sale. See Asahi, 480 U.S. at 117. Thus,
regardless of which side of the Asahi debate is taken, Giacomini's
actions amount to minimum contacts sufficient to justify the exercise
of personal jurisdiction.

 The trial court's exercise of personal jurisdiction over Giacomini is
also consistent with Texas precedent in this area. In CMMC v. Salinas,
the Texas Supreme Court determined that a Texas trial court could not
assume personal jurisdiction over a French manufacturer merely
because the manufacturer knew its allegedly defective product would
be shipped to Texas. CMMC, 929 S.W.2d at 436. In that case, a small
winery in Texas purchased an allegedly defective winepress from an
equipment distributor that was a New York corporation. Id. The
distributor ordered the winepress from a French manufacturer, CMMC. 
Id. The French manufacturer shipped the winepress to the winery FOB
the Port of Houston, in accordance with the New York distributor's
instructions. Id. The Texas winery took title to the winepress in
Houston and paid for transportation to the winery. Id. The French
manufacturer had no direct contact with the winery. Id. at 436­37.

 The French manufacturer had no other contacts with Texas. Id. 
It was a French corporation that sold wine production equipment
primarily in Europe. Id. at 437. It had sold some equipment in the U.S.,
including a direct sale to another winery in Texas. Id. It did not directly
market or advertise its equipment in the U.S., but did provide
promotional material to its distributor. Id. at 436­37. Customers could
buy its products either directly or through a distributor. Id. at 436.

 The New York distributor had no offices in Texas and had only
made three or four sales of equipment in Texas for the prior ten year
period. Id. at 437. It had no contractual arrangements with the French
manufacturer, and the two companies shared no employees. Id. at 436. 
The distributor advertised the manufacturer's products, but the
manufacturer did not specifically authorize or approve the ads. Id. The
distributor's marketing efforts were primarily directed toward California,
but it also advertised in nationally circulated wine industry magazines. 
Id. at 437.

 The Texas Supreme Court found that the French manufacturer had
insufficient contacts to justify a Texas courts' exercising personal
jurisdiction over it. Id. at 437, 439­40. It stated:

 [The French manufacturer]'s wine-producing equipment did
not regularly find its way to Texas. Neither [the French
manufacturer] nor [the distributor] made any effort to market
[the manufacturer's] equipment in Texas, other than by
advertisements in magazines with national circulation. [The
Texas winery's] purchase was an isolated event. [The
distributor] did not contact [the winery]; [the winery]
contacted [the distributor]. [The winery] never had any
contacts at all with [the French manufacturer]. [The
manufacturer's] mere knowledge that its winepress was to
be sold and used in Texas and its wiring the machine for use
in the United States were not sufficient to subject [it] to the
jurisdiction of Texas courts. This evidence simply does not
show that [the manufacturer] designed products for use in
Texas, or that it made any effort to market them here, or that
it took any other action to purposely avail itself of this
market. Even Justice Brennan's view of the
stream-of-commerce doctrine would not allow jurisdiction
absent a "regular and anticipated flow of products from
manufacture to distribution to retail sale." There is no flow
of products from [the manufacturer] to Texas; there is
scarcely a dribble.


Id. at 439.

 Giacomini's case is different. The sale of Giacomini's products in
Texas to Texas residents is not an isolated event. Giacomini's gas
valves did regularly find their way to Texas. Giacomini's distributor did
make efforts to market the gas valves in Texas. The evidence showed
that Giacomini sold to B&K over 3,000,000 products in one year, which
it, in turn, sold throughout the United States, including in Texas. 
Approximately 250,000 of Giacomini's products are currently shipped
to the Port of Houston annually. An officer of Giacomini's distributor
stated that Giacomini was aware that its products were being
distributed in Texas, not only by B&K, who sold "many" of the
3,000,000 valves it purchased in 1999 in Texas, but also by Giacomini's
other U.S. distributors. This is a far cry from the isolated sales in Texas
made by the French wine equipment manufacturer in CMMC. This
substantial, regular and continuing flow of products from Giacomini to
B&K, with roughly 250,000 products being shipped directly to Texas,
and a substantial number of the products being regularly sold in Texas,
distinguishes this case from CMMC.

 We also find this case distinguishable from CSR Ltd. v. Link, 925
S.W.2d 591 (Tex. 1996). There, the Texas Supreme Court held that an
Australian corporation who sold asbestos to another company that
immediately shipped the asbestos to Houston, Texas, did not have
minimum contacts with the State of Texas for the exercise of personal
jurisdiction. Id. at 595­96. Title to the asbestos was transferred in
Australia. Id. at 595. The Australian company neither "created,
controlled, or employed" the distribution system that brought the
asbestos to Texas. Id.

 The plaintiffs argued that because the company that bought the
asbestos and shipped it to Houston was the Australian company's only
agent that sold asbestos in the United States, the Australian company
should be subject to Texas jurisdiction based on a theory of
foreseeability. Id. Rejecting that approach, the Texas Supreme Court
noted that "[a]lthough foreseeability is a factor to consider in a
minimum contacts analysis, foreseeability alone will not support
personal jurisdiction." Id. Rather, "[t]he defendant must take an action
'purposefully directed toward the forum state' to be subject to the
jurisdiction of its courts." Id. (quoting Asahi, 480 U.S. at 112). The
court reiterated that "'a defendant's awareness that the stream of
commerce may or will sweep the product into the forum state does not
convert the mere act of placing the product into the stream into an act
purposefully directed toward the forum State.'" Id. (quoting Asahi, 480
U.S. at 112). Ultimately, the court said that "there must be some
indication that CSR intended to serve the Texas market." Id.

 Again, significant distinctions exist between that case and the
present case. Here, there are indications that Giacomini intended to
serve the Texas market. Giacomini shipped hundreds of thousands of
products to Texas and sold to distributors with knowledge that many
of its products would be sold in Texas. In a sense, Giacomini
"employed" the distribution system that brought its products to Texas.

 Likewise, Giacomini's situation is distinguishable from that
presented to this Court in Happy Indus. Corp. v. American Specialties,
Inc., 983 S.W.2d 844 (Tex. App.--Corpus Christi 1998, pet. dism'd
w.o.j.). There, a Texas corporation purchased two commercial
embroidery machines manufactured by Happy Industries, a Japanese
corporation ("Happy"). Id. at 846­47. The Texas corporation first saw
the machines at a trade show held in Dallas, Texas, where they were
being promoted and advertised by another company called Data Stitch,
Inc. Id. at 847. Data Stitch indicated to the Texas corporation that the
machines were manufactured by a Japanese corporation ("Happy"),
and represented that it was actually an agent for Happy. Id. The Texas
corporation bought two machines from Data-Stitch, and they were
installed by Data-Stitch. Id. The machines that were purchased were
indeed manufactured by the Japanese manufacturer, Happy. Id.

 However, Happy produced evidence showing that it had no
contact whatsoever with either Data-Stitch or another company,
TexMac, that had also been represented to the plaintiff as an authorized
Happy distributor. Id. at 849. Rather, Happy sold its products to a
company called Itochu, and then it had no further authority over the
manner the product was distributed. Id. This Court stated:

 Happy's contacts with Texas arose from ASI's purchase of
two commercial embroidery machines. Although Happy
manufactured the machines ASI bought them from
Data-Stitch who in turn received them from Texmac. Happy
had no agency relationship or other affiliation with either
company. The [plaintiff's] affidavits refer to sales of other
Happy embroidery machines in Texas and other states, but
there is no evidence to show how those alleged machines
reached Texas due to any purposefully directed activities of
Happy or any other link with the business entity.

Id. at 851 (citations omitted). Ultimately, this Court held that Happy did
not have minimum contacts with Texas because the plaintiff failed "to
show any nexus between its acquisition of the two commercial
embroidery machines and any act or consummation of a transaction by
Happy in Texas." Id.

 Giacomini's situation is far different from that in Happy, as well. 
Rather than the placement of two products in the State of Texas,
Giacomini has regularly shipped hundreds of thousands to the state
with the awareness that many were going to be sold inside the state. 
Also, Happy had no contacts with the State of Texas at all, whereas,
Giacomini regularly ships to the Port of Houston. We hold that
Giacomini has minimum contacts with the State of Texas sufficient to
authorize an exercise of specific jurisdiction over it in the context of this
lawsuit.

B. Fair Play & Substantial Justice


 Even when minimum contacts are established, a Texas court may
not exercise jurisdiction over a nonresident defendant unless the
exercise of jurisdiction comports with traditional notions of fair play and
substantial justice. Accord CMMC, 929 S.W.2d at 437. The Texas
Supreme Court has stated that "[i]n this inquiry, it is incumbent upon
the defendant to present 'a compelling case that the presence of some
consideration would render jurisdiction unreasonable.'" Guardian Royal
Exch. Assur., Ltd., 815 S.W.2d at 231 (quoting Burger King, 471 U.S.
at 477). The following factors, when appropriate, should be
considered: (1) the burden on the defendant; (2) the interests of the
forum state in adjudicating the dispute (including the state's special
regulatory interest in areas such as insurance); (3) the plaintiff's interest
in obtaining convenient and effective relief; (4) the interstate judicial
system's interest in obtaining the most efficient resolution of
controversies; and (5) the shared interest of the several states in
furthering fundamental substantive social policies. Id. "Only in rare
cases, however, will the exercise of jurisdiction not comport with fair
play and substantial justice when the nonresident defendant has
purposefully established minimum contacts with the forum state." Id.
(citing Burger King, 471 U.S. at 477-78). Rather, "[m]ost such
considerations usually may be accommodated through means short of
finding jurisdiction unconstitutional," for example, through application
of the forum's choice-of-law or change of venue rules. Id. (citing Burger
King, 471 U.S. at 477). Also, "distance alone is not ordinarily sufficient
to defeat jurisdiction: 'modern transportation and communication have
made it much less burdensome for a party sued to defend himself in a
State where he engages in economic activity.'" Id.

 We hold that the Texas court's exercise of personal jurisdiction
over Giacomini does not offend traditional notions of fair play and
substantial justice. While international litigation does present a
substantial burden on the defendant, the burden is not unreasonable
considering the fact that a significant number of Giacomini's products
are regularly shipped to and sold in this state. Moreover, the burden on
the plaintiff would be at least as great as the burden on Giacomini,
especially in light of the fact that the plaintiff's injuries have no relation
to any activity the plaintiff conducted in Italy. When a Texas citizen is
injured by a defectively manufactured product that is marketed to the
citizens of this state, the state has a considerable interest in its citizen's
ability to seek redress for his damages.

 This case is similar to a case recently decided by the Texarkana
court of appeals, LeBlanc v. Kyle, 28 S.W.3d 99, 105­106 (Tex.
App.--Texarkana 2000, pet. filed Oct. 27, 2000). That court held that
maintaining an action against a French manufacturer for an allegedly
defective water heater that was sold in Texas did not offend traditional
notions of fair play and substantial justice. Id. The court stated,

 Kyle purchased and installed the water heater in Texas,
which means that he has a strong interest in litigating the
case here. Considering that LeBlanc sent over 450 of its
water heaters into Texas pursuant to its contract with
Controlled Energy, LeBlanc could reasonably anticipate being
brought into court here. World-Wide Volkswagen, 444 U.S.
at 297, 100 S.Ct. 559. Just because this is an "international
dispute" does not mean that maintaining jurisdiction in Texas
is unfair. In Asahi, a majority of the Court found that
California did not have a sufficient interest in litigation
between a Japanese company and a Taiwanese company. 
Asahi, 480 U.S. at 116. In contrast, Texas has an interest in
litigation between one of its citizens and a manufacturer and
supplier of products to its market.


LeBlanc, 28 S.W.3d at 105­106. Similarly, we do not find that the
district court's exercise of jurisdiction over Giacomini offends traditional
notions of fair play and substantial justice. We affirm the order of the
trial court denying Giacomini's special appearance.(1)

 ______________________________

 J. BONNER DORSEY,

 Justice


Publish
.

Tex. R. App. P. 47.3(b).


Opinion delivered and filed

this 1st day of March, 2001.

1. In its first issue, Giacomini complains of the trial court's failure to
file findings of facts and conclusions of law and suggests that this
Court should abate this appeal and instruct the trial court to file them. 
Because the facts are undisputed, we do not address this point. 
Additionally, the parties raised at oral argument an issue regarding
supplementation of the record. Because that issue, also, would not
impact the outcome of this appeal, we do not address it either. See Tex.
R. App. P. 47.1.